UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DESHAWN ANDERSON-SANTOS,

    Plaintiff,                                      Hon. Jane M. Beckering

v.                                                       Case No. 1:21-cv-453

KENT COUNTY, et al.,

    Defendants.
_____/

**REPORT AND RECOMMENDATION**

Plaintiff DeShawn Anderson-Santos (Anderson) has sued Defendants Kent County and Derek Leshan pursuant to 42 U.S.C. § 1983, alleging that Leshan used excessive force on him, in violation of the Eighth Amendment, or alternatively, the Fourteenth Amendment, while he was incarcerated at the Kent County Juvenile Detention Center. Anderson further alleges that Kent County is liable for the constitutional violation under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Presently before me is Defendants' Motion for Summary Judgment. (ECF No. 61.) Pursuant to 28 U.S.C. § 636(b)(1)(B), I recommend that the motion be **GRANTED IN PART AND DENIED IN PART**.[1]

### I. Background

On January 14, 2020, having been previously convicted by plea of one count of unarmed robbery and one count of armed robbery in the Family Division of the Kent County Circuit Court (ECF No. 62-2), Anderson was incarcerated at the Kent County Juvenile Detention Center

---

[1] Defendants' request for oral argument is denied because the issues are adequately briefed, and oral argument would not further aid the decisional process.

(KCJDC). Around 2:15 p.m. that day, the detainees housed in Unit E, including Anderson, returned to the unit and began to prepare for the afternoon shift change. Defendant Leshan, a Youth Specialist at KCJDC, was assigned to work in Unit E that day. (ECF No. 62-5 at PageID.288.) To prepare for a shift change, detainees are required to enter their rooms, shut the door, and leave their pants and shoes outside of their room while continuing to wear their shorts and socks. (ECF No. 62-4 at PageID.270; ECF No. 62-5 at PageID.291.)

Because Anderson failed to comply with Leshan's directive to the detainees to go into their rooms, Leshan issued him a brief timeout, which he successfully completed. (*Id.* at PageID.291, 302; ECF No. 62-7 at PageID.320; ECF No. 62-8 at PageID.341.) Following the timeout, Leshan approached Anderson and they engaged in some conversation about Anderson's failure to go into his room. During this exchange, Anderson had entered his room and was standing on the slippery, polished concrete in his regular socks (without slip-resistant strips on the soles).[2] (ECF No. 62-4 at PageID.270; ECF 62-5 at PageID.291; ECF No. 62-7 at PageID.322.) As they continued to speak, Leshan pushed Anderson in the chest with one hand, causing him to fall backward, hit his head on the brick edge of his bed, and black out for a few seconds. (ECF No. 62-4 at PageID.270, 273; ECF No. 291–92.) Leshan asked Anderson whether he needed ice or wanted to see the nurse, and Anderson asked for ice. (ECF No. 62-5 at PageID.292.) When Leshan returned with ice, he saw that Anderson was bleeding from his head and took him to the medical clinic. (*Id.* at PageID.298.)

At the clinic, Sandra Rawls, R.N., examined Anderson while Leshan waited nearby outside the doorway. (ECF No. 62-13 at PageID.382.) Leshan told Rawls that Anderson hit his head on

---

[2] The video Anderson submitted as Exhibit X depicts the polished, shiny concrete floor on the perimeter of the dayroom.

the corner of his bed in his room after he stumbled and fell. (ECF No. 62-11 at PageID.366.) Rawls also documented that Anderson said that he stumbled and fell after Leshan pushed him. (ECF 62-12 at PageID.375.) Anderson reported that he was experiencing mild pain at the time. (ECF No. 62-11 at PageID.363.) Rawls noted that Anderson sustained a small laceration—about the size of a dime—making stitches unnecessary. She cleaned the area with saline, applied antibiotic ointment, gave Anderson Tylenol, and told him to ice the area. (*Id.* at PageID.364; ECF No. 62-12 at PageID.375.) Rawls arranged for the second shift nurse to follow up with Anderson later in the day, and noted that he appeared hesitant about providing more information about the incident with Leshan present. (ECF No. 62-11 at PageID.363; ECF No. 62-12 at PageID.375.)

Subsequent investigation disclosed a more detailed picture of what had occurred. Jaime Sage, R.N., a nurse supervisor at the clinic, was in the adjacent office when Rawls examined Anderson. Sage could hear only some of Rawls's exchange with Anderson, but she could see what was happening and thought that Leshan's presence was unusual because "a float"—a Youth Specialist not assigned to a specific floor—usually transported detainees to and from the clinic. (ECF No. 62-13 at PageID.382.) She believed that Leshan's presence might have inhibited Anderson from speaking freely, so she contacted Jeff Love, the shift supervisor that afternoon. (ECF No. 62-6 at PageID.309; ECF No. 62-13 at PageID.382.) Love spoke with Anderson twice, once only briefly before the shift change and again in more detail shortly after the new shift began. Anderson did not appear "dazed or confused" when Love spoke to him the second time. Anderson told Love that he "was moving a little bit too slow" and that Leshan "was playing around and he pushed [Anderson] too hard." Anderson said that Leshan pushed him backward and he lost his balance, but he thought that it "didn't seem like he did it on purpose, he was just messing, but I

3

fell." (ECF No. 62-6 at PageID.310.) Later, Love gave Anderson a grievance form, on which Anderson reported:

> I was on my way [to] my room an[d] as I was walking into my room the staff which is [Leshan] followed me in[.] [H]e t[ried] to pull off a[] joke an[d] pushed me hard an[d] I f[ell] an[d] hit my head on the corner on the brick and this happened around 2:25 right around shif[t] change an[d] it also led up to me bleeding.

(ECF No. 62-1; ECF No. 62-4 at PageID.272–72; ECF No. 62-6 at PageID.311.)

Love decided to report the matter "up the ladder," and notified Huemartin Robinson, the Assistant Superintendent of Detention, later that day. (*Id.*) Robinson contacted the nurse, who described what had occurred and indicated that Leshan "was acting pretty squirrely about it." (ECF No. 62-7 at PageID.318.) Robinson knew Anderson well from his frequent stays in the facility and had a good relationship with him, so he spoke to Anderson about the incident at approximately 5:30 p.m. on January 14. (*Id.*) After assuring Anderson that "he could talk freely and speak truthful," Anderson told Robinson that Leshan was "trying to pull off a joke on him" because Leshan always joked around with Anderson. Anderson said that as he and Leshan were standing inside the doorway to his room, Leshan said, "what happened to your sweater?" When Anderson looked down, Leshan pushed him, and he slipped and hit his head. (*Id.* at PageID.322.) Robinson noted that Anderson said that he had a headache, but described him as "very coherent" during their conversation. (*Id.* at PageID.318.)

Robinson also reviewed a video of Unit E during the time of the incident, after which he "was pretty sure as to what happened." (*Id.* at PageID.320.) Robinson explained that, although the video does not show the incident itself, it depicts the mood and activity preceding the incident:

> [Anderson] was kind of doing his own thing. He got – was issued a five-minute timeout . . . by [Leshan] because of noncompliance. He successfully processed that five-minute timeout, continued to kind of joke and play about, you know, going into the room, asking different questions and everybody else was locked down. You know, and then the next thing that after he processed the timeout, the next thing I

4

> heard was [Anderson] talking and, you know, you couldn't see anything, but next thing you heard was oh, you fell.

(*Id.*)

Robinson reported the incident to KCJDC Superintendent Stacy McGinnis, who followed up with both Anderson and Leshan two or three days later. (ECF No. 62-8 at PageID.332.) Consistent with his grievance and his statements to Love and Robinson, Anderson told McGinnis that Leshan "was joking around" with Anderson and pushed him. (*Id.* at 336.) Leshan's version was slightly different. He told McGinnis that he had placed his hand on Anderson's shoulder and was walking him into his room when Anderson slipped and hit his head. (*Id.* at 336, 342.)

Because Anderson's injury resulted from staff conduct, McGinnis notified the State of Michigan. (*Id.*) Holly Austin, a Licensing Consultant from the Michigan Department of Health and Human Services (MDHHS), investigated the matter for the State and Scott Null investigated on behalf of Children's Protective Services (CPS) and the Michigan Department of Health and Human Services. Austin and Null participated in the same interviews. (ECF No. 62-9 at PageID.350.) During his interview, Anderson described Leshan's push as "playful," although he thought that Leshan must have been attempting to push him to the ground because he was so much bigger than Anderson. However, he did not think that Leshan intended that he hit his head. (*Id.* at 351–52.) Anderson said that Leshan "was trying to play a joke on him by telling him that Mr. Anderson's sweater was ripped at the back of the shoulder and that when Mr. Anderson looked for the rip, Mr. Leshan pushed him on his chest with one hand." (*Id.* at PageID.354–55.) Null confirmed this statement in his CPS report, noting that Anderson said that Leshan was trying to "pull off a joke" when he asked, "how did you rip your shirt," and pushed Anderson when he looked down. (CPS Report at 5 (filed under seal).) Anderson also said that he was wearing socks and the floors are slippery. (ECF No. 62-9 at PageID.355.) In his interview, Leshan told Austin

5

and Null that when Anderson refused to go into his room, he placed his hand on Anderson's shoulder area and began walking him into his room and as they were walking, Anderson slipped and fell backward. Leshan admitted that use of his hand to direct Anderson into his room violated KCJDC's "Handle with Care" policy/technique. (*Id.* at PageID.355; ECF No. 62-16.)

Austin concluded that Leshan violated KCJDC's policies by placing his hand on Anderson, and she worked with McGinnis to develop a corrective action plan. (ECF No. 62-9 at PageID.352; ECF No. 62-16 at PageID.409.) In his report, Null found that Leshan was acting "in a joking manner" when he asked Anderson how he ripped his sweater and pushed him when he looked down. While Null concluded that Leshan's conduct was unprofessional and violated policy, he did not believe that Leshan was "malicious in his intent." (ECF No. 62-17 at PageID.431; CPS Report at 15.)

In his deposition taken in this case on May 11, 2022, Anderson gave an account of the incident that differed in most details from his prior statements. Anderson said that he was in his room playing with a stretch ball with the door closed, when Leshan opened the door and pushed him hard. Anderson said that he could not recall joking around with Leshan, but consistent with his prior statements, he remembered Leshan saying, "look down or something." (ECF No. 62-4 at PageID.270, 272.) While Anderson could not recall writing the grievance, he conceded that he must have done so because it was in his handwriting. (*Id.*) When Leshan was deposed in this case on May 9, 2022, he testified that after completing his timeout for not going into his room initially, Anderson still had not gone into his room, but the mood was "very light" and "kind of joking." Leshan testified that he put his right hand on Anderson's left shoulder and began walking him backward into his room, and as he did so, Anderson's right foot slipped on the floor, and he fell backward. (ECF No. 62-5 at PageID.291.)

6

As a result of the incident, Leshan received a three-day suspension for violating KCJDC's "Handle with Care" policy, which precludes staff from placing their hands on residents except in narrowly defined situations. (ECF No. 342–43; ECF No. 62-15; ECF No. 75-12.)

## II.  Motion Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Material facts are facts that are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). When video evidence is presented, witness testimony will not create a genuine issue of material fact if the video is unambiguous and answers the pertinent factual questions. *See Shreve v. Franklin Cnty.*, 743 F.3d 126, 132 (6th Cir. 2014) (citing *Scott v. Harris*, 550 U.S. 372, 380–81 (2007)).

## III.  Discussion

### A.  Excessive Force

In addressing whether Anderson has established a constitutional violation, I begin with the state of the evidence: does an issue of fact remain as to what happened during January 14, 2020 incident? At least three versions exist: (1) Anderson's repeated statements during the investigation stage that Leshan, in a joking manner, told Anderson that his sweater was ripped and pushed him when he looked down at the sweater; (2) Anderson's deposition testimony that he was in his room

7

with the door closed when Leshan opened the door and pushed him; and (3) Leshan's version that Anderson slipped while Leshan had his hand on Anderson's shoulder and was walking him backward into his room.

In addition to the evidence discussed above, Plaintiff has submitted a video of the events in the dayroom at the time of the incident. Regarding video evidence, the Supreme Court has stated, "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). The video is not fully *Scott*-worthy because it does not show the actual incident, but it is telling in many respects, particularly through its contemporaneous audio. Activity begins with KCJDC residents entering the Unit E dayroom and removing their shoes and pants outside of their rooms. At around 3:49 on the time counter, Anderson is seen approaching the table near the office, and Leshan issues him a timeout for failing to go into his room. By approximately 5:40, all of the residents except Anderson, who is still serving his timeout, have entered their rooms. Leshan then begins to check the residents' rooms, and at about 6:15, approaches Anderson where he is standing. Anderson begins speaking as Leshan stands next to him looking around the room. At about 6:41, Leshan walks toward Anderson's room and disappears from the camera, but they both continue talking. At 6:51–52, Leshan is heard saying, "You ripped it," and at 6:54–55 saying, "Oh, my God, you fell."

This information and the associated video warrant conclusions that bear on what actually occurred. First, based on both the video and audio, no reasonable jury could accept Anderson's deposition version that he had gone inside his room, closed the door, and begun playing with a ball when Leshan opened the door and pushed him. The audio is clear: Leshan and Anderson remained

8

verbally engaged the entire time until Leshan said, "You ripped it." In other words, there is absolutely no indication during any part of this interaction that Anderson had separated himself from Leshan by closing his door. Second, Leshan's statement corroborates what Anderson told everyone all along, including in his grievance that he admitted writing: Leshan asked Anderson about his sweater being ripped and pushed Anderson when he looked down, causing him to slip and fall backward.

Having framed the summary judgment facts, I next determine the proper constitutional standard. Anderson brings his claim under both the Eighth Amendment and the Fourteenth Amendment. At the time of the incident, Anderson had pled guilty to two robbery offenses, but had not yet been sentenced. (ECF No. 62-2.) Nonetheless, under these circumstances, "the more demanding Eighth Amendment standard is applicable." *Morgan ex rel. Morgan v. Wayne Cnty.*, 33 F.4th 320, 326 (6th Cir. 2022) (Eighth Amendment standard appropriate where the plaintiff was both a pretrial detainee and a convicted prisoner at the time of the incident); *see also Uraz v. Ingham County Jail*, No. 1:19-cv-550, 2019 WL 4292394, at *7 (W.D. Mich. Sept. 11, 2019) (concluding that an inmate's claim was subject to the Eighth Amendment standard where he had pled guilty to an offense but had not yet received his sentence).

The Eighth Amendment's prohibition against cruel and unusual punishment applies not only to punishment imposed by the state, but also to deprivations that occur during imprisonment and are not part of the sentence imposed. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Estelle v. Gamble*, 429 U.S. 97, 101-02 (1976). Punishment that is without penological justification or involves the unnecessary and wanton infliction of pain also violates the Eighth Amendment's proscriptions. *See Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). In other words, the Eighth

9

Amendment prohibits "the gratuitous infliction of suffering." *Gregg v. Georgia*, 428 U.S. 153, 183 (1976).

Claims alleging the excessive use of force have both a subjective and an objective component. *See Wilson v. Seiter*, 501 U.S. 294, 298–99 (1991). The objective component requires the "pain inflicted to be 'sufficiently serious'" to offend "contemporary standards of decency." *Cordell v. McKinney*, 759 F.3d 573, 580 (6th Cir. 2014) (quoting *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011)); *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)). While the extent of a prisoner's injury is relevant to this inquiry in the sense that it may shed light on the amount of force used, it is not dispositive of whether an Eighth Amendment violation has occurred. *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). "Injury and force . . . are only imperfectly correlated, and it is the latter that ultimately counts." *Id.* at 38. Thus, "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated . . . whether or not significant injury is evident." *Hudson*, 503 U.S. at 9.

The subjective component asks "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* at 6–7. In determining whether the use of force is wanton and unnecessary, a court should evaluate the need for application of force, the relationship between that need and the amount of force used, the threat "reasonably perceived by the responsible officials," and any effort made to temper the severity of the forceful response. *Id.* (citing *Whitley v. Albers*, 475 U.S. 312, 321 (1986)). In *Wilkins*, the Court affirmed that the proper focus is not on the degree of injury the plaintiff sustained, but whether the officer applied force for the legitimate purposes of maintaining or restoring order or discipline or "maliciously and sadistically to cause harm." 559 U.S. at 37 (quoting *Hudson*, 503 U.S. at 7). The Court noted that the degree of injury is still relevant to the inquiry, as it may shed some light on

10

the amount of force used, but "[a]n inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Id.* at 38 (quoting *Hudson*, 503 U.S. at 9).

Defendants contend that summary judgment is warranted because Leshan's single push of Anderson does not constitute force that amounts to an Eighth Amendment violation. They note that federal courts have held that a single isolated push, shove, or blow by a prison guard using *de minimis* force is outside the purview of the U.S. Constitution. (ECF No. 62 at PageID.244 (citing *Moher v. United States*, 875 F. Supp. 2d 739, 758 (W.D. Mich. 2012)). Defendants argue that the evidence shows that Leshan pushed Anderson with a single hand to the chest while joking around, causing Anderson to slip and suffer a minor head injury that quickly healed without any treatment other than ice and Tylenol on the afternoon of the incident. Thus, they contend, Leshan's conduct is not actionable under the Constitution. (*Id.* at PageID.244–45.)

As Defendants correctly note, the Eighth Amendment has limits in the use-of-force context. Not "every malevolent touch by a prison guard gives rise to a federal cause of action." *Hudson*, 503 U.S. at 9. "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Id.* at 9–10 (quoting *Whitley*, 475 U.S. at 327). Nonetheless, as set forth above, the central focus in an Eighth Amendment claim is the amount of force used rather than the degree of injury. Here, although Defendants contend that Leshan's push amounted to nothing more than a *de minimis* use of force, I find that a question of fact remains as to the amount of force that Leshan used. Defendants characterize the push as *de minimis*, while Anderson claims that he "was pushed hard." (ECF No. 62-4 at PageID.271.) Perhaps to Leshan the force was *de minimis*, but it is important to remember

11

that he was much larger than Anderson, outweighing him by more than 200 pounds. (*Id.* at PageID.280; ECF No. 62-5 at PageID.287.) In fact, the push was hard enough to cause Anderson to slip or fall backward and hit his head. Moreover, Leshan testified that there was no need to use force on Anderson at that time. (*Id.* at PageID.299.) Thus, it is questionable whether Leshan's use of any force, *de minimis* or not, was constitutionally permissible. *See Dobbins v. Giles*, 451 F. App'x 849, 851 (11th Cir. 2012) (reversing grant of summary judgment in excessive force case alleging blow between the eyes and slap to the face were excessive where the plaintiff presented evidence that there was no need for force); *Fontana v. Haskin*, 262 F.3d 871, 880 (9th Cir. 2001) ("[W]here there is no need for force, *any* force used is constitutionally unreasonable." (internal quotation marks omitted; emphasis in original)); *Miller v. Rubenstein*, No. 2:16-cv-05638, 2018 WL 650209, at *4 (S.D. W.Va. Jan. 31, 2018) (under *Hudson*, "[i]f there was no need for force, then any force used was excessive"). For example, when used to control an unruly inmate in the prison setting, chemical spray is a constitutionally-permissible application of force. *See Jennings v. Mitchell*, 93 F. App'x 723, 725 (6th Cir. 2004) (holding that the defendant corrections officers did not violate the Eighth Amendment by using pepper spray on the plaintiff when he refused their repeated orders to leave the shower); *White v. Fowler*, No. 88-2216, 1989 WL 88479, at *1 (6th Cir. Aug. 8, 1989) (affirming grant of summary judgment to corrections officer who used chemical spray on the plaintiff in order to restore discipline and security on a prison bus). Yet, use of chemical spray without necessity violates the constitution, even if the resulting injury is *de minimis*. *See Smith v. Bigham*, No. 1:17-cv-128, 2018 WL 2100518, at * 6 (S.D. Ohio May 7, 2018), *report and recommendation adopted*, 2018 WL 2735648 (S.D. Ohio June 7, 2018) ("[C]onstruing disputed facts in Plaintiff's favor as to the circumstances under which the pepper spray was allegedly deployed, the Defendant is not entitled to summary judgment because even if

the injury that resulted was *de minimis*, the use of OC spray was for no reason other than in retaliation for Plaintiff's complaints, and therefore was purely malicious and sadistic."). Thus, even if the minor head laceration that Anderson sustained, along with his momentary loss of consciousness and subsequent headaches, are considered *de minimis* injury, a material question of fact remains.[3]

Defendants also contend that Anderson's claim fails on the subjective prong because, while Leshan's conduct was unprofessional, the evidence shows that he was simply joking around and did not act with wantonness or knowing willingness that the harm should occur. On this record, a jury may well find that Leshan's push was merely joking or playful without any malicious intent and that Anderson correctly perceived Leshan's state of mind as joking, as he described in his grievance. But the inquiry here is subjective, and while not overwhelming, there is sufficient circumstantial evidence from which a jury could infer that the incident was not a joke. In *Payne v. Parnell*, 246 F. App'x 884 (5th Cir. 2007), the Fifth Circuit reversed the district court's grant of summary judgment to a defendant who, similar to Leshan in this case, claimed that he acted only "jokingly," or was engaged in "horseplay," when he used a cattle prod on the plaintiff without reason. Despite this assertion, the court found sufficient evidence from which a jury could infer that the defendant acted maliciously and sadistically in unnecessarily and wantonly inflicting pain on the plaintiff. *Id.* at 887. Among other things, the court cited the defendant's initial denial that the incident had occurred and his later assertion—only after other witnesses confirmed they had witnessed the incident—that he used the cattle prod "only in a joking manner." *Id.* at 887–88.) Similarly, in this case, given Leshan's evolving story, as well as his belated claim that he was

---

[3] Although the parties dispute whether Anderson may testify about memory loss, visions problems, and headaches that he has experienced since the incident without supporting medical evidence, I find no need to address that issue for purposes of summary judgment.

13

simply joking around, a reasonable jury could choose to disbelieve Leshan's explanation. As well, a reasonable jury may consider the surrounding circumstances—Anderson's initial and continued failure or refusal to go into his room—as stoking something more than a joking mood from Leshan.[4]

Leshan also raises the defense of qualified immunity. (ECF No. 62 at PageID.240–41.) The doctrine of qualified immunity provides that government officials performing discretionary functions are generally shielded from liability for civil damages insofar as their conduct does not violate a clearly established statutory or constitutional right of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999). An "objective legal reasonableness" test is used to determine whether the official could reasonably have believed his conduct was lawful. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

The qualified immunity inquiry requires a court to decide whether the facts as alleged or shown make out a constitutional violation or whether the right that was allegedly violated was a clearly established right at the time of the alleged misconduct. *Id.* at 232. If the court can conclude that either no constitutional violation occurred or that the right was not clearly established,

---

[4] Defendants cite *Neal v. Miller*, 778 F. Supp. 378 (W.D. Mich. 1991), as an example of a gratuitous use of force that the court found was *de minimis*. I find *Neal* inapplicable to the present circumstances, as it was decided after an evidentiary hearing, or bench trial, on the plaintiff's claims.

qualified immunity is warranted. The court may consider either prong of the inquiry without regard to sequence. *Id.* at 236.

As discussed above, an issue of fact remains as to whether Leshan violated the Eighth Amendment by using excessive force on Anderson in a malicious or sadistic manner. Accordingly, Leshan is not entitled to qualified immunity on Anderson's claim. *See Cameron v. Seitz*, 38 F.3d 264, 273 n.2 (6th Cir. 1994) ("Summary judgment would be inappropriate . . . if there were a factual dispute as to an issue on which the question of immunity turns or if the undisputed facts show that the defendant's conduct violated clearly established rights.") (citing *Poe v. Haydon*, 853 F.2d 418, 426 (6th Cir. 1988)). Moreover, a prisoner's right to be free from the gratuitous infliction of force was clearly established as of January 14, 2020. *See Hudson*, 503 U.S. at 9 ("When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated[,] . . . whether or not significant injury is evident." (internal citation omitted)); *Clay v. Coy*, No. 12-10140, 2013 WL 1278396, at *5 (E.D. Mich. Feb. 25, 2013), *report and recommendation adopted*, 2013 WL 1278496 (E.D. Mich. Mar. 26, 2013) (noting that "the right of a prisoner to be free from gratuitous violence that does not further a legitimate penological interest was clearly established at the time of the incident in question" (citing *Hudson*)); *cf. Wilkins*, 559 U.S. at 38 ("An inmate who complains of a push or shove that causes no discernible injury almost certainly fails to state a valid excessive force claim" (internal quotation marks omitted)).

    **B.**    *Monell* **Claim**

In Count III of his complaint, Anderson alleges a claim of municipal liability against the County pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978). A municipality may only be liable under Section 1983 when its policy or custom causes the injury, regardless of the form of relief sought by the plaintiff. *Los Angeles Cnty. v. Humphries*, 562 U.S. 29, 39 (2010) (citing *Monell*, 436 U.S. at 694). In a municipal liability claim, the finding of a policy or custom

is the initial determination to be made. *Doe v. Claiborne Cnty.*, 103 F.3d 495, 509 (6th Cir. 1996). The policy or custom must be the moving force behind the constitutional injury, and a plaintiff must identify the policy, connect the policy to the governmental entity, and show that the particular injury was incurred because of the execution of that policy. *Turner v. City of Taylor*, 412 F.3d 629, 639 (6th Cir. 2005); *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003).

Anderson alleges that the County failed to adequately train and/or supervise its corrections officers regarding the proper use of force and that the County failed to properly supervise or discipline its corrections officers whom it knew or should have known were violating citizens' constitutional rights. (ECF No. 1 at PageID.7–8.) "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). To establish this type of claim, a plaintiff must show that: "1) the [municipality's] training program was inadequate for the tasks that [its employees] must perform; 2) the inadequacy was the result of the [municipality's] deliberate indifference; and 3) the inadequacy was closely related to or actually caused the injury." *Jackson v. City of Cleveland*, 925 F.3d 793, 834 (6th Cir. 2019) (quoting *Ciminillo v. Streicher*, 434 F.3d 461, 469 (6th Cir. 2006)). Generally speaking, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference[.]" *Connick*, 563 U.S. at 62 (quoting *Board of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)). To impose liability under a failure-to-supervise theory, a plaintiff must show that: (1) the defendant government was aware, or on notice, that its employees committed or were likely to commit constitutional violations; (2) it chose not to take corrective action with deliberate indifference to the consequences for individuals' constitutional rights; and (3) the lack of corrective action actually caused the alleged constitutional violation. *Mize v. Tedford*, 375 F. App'x 497, 500 (6th Cir. 2010).

In support of its motion for summary judgment, the County points to Leshan's deposition testimony that during his 24 years of employment with the County at KCJDC, he has received annual training on numerous subjects, including on the "Handle with Care" policy. (ECF No. 62-5 at PageID.300.) Leshan has also instructed other employees on the policy. *Id.* In addition, the County has submitted Leshan's training records during his period of employment with the County, which show that he received extensive training over the years on a variety of subjects relevant to the operation of the facility, including the "Handle with Care" policy. (ECF No. 62-18.)

Anderson points to no evidence in his response refuting the County's evidence of Leshan's extensive training or explaining why such training was inadequate for the tasks that a Youth Specialist at KCJDC must perform in dealing with youth residents. Nor does Anderson even argue that the County had prior notice or knowledge that its training program was inadequate in any respect. Rather, Anderson merely asserts that a single incident can support liability under *Monell* for failure to train, but he points to no flaws in the County's "Handle with Care" policy that led to the alleged improper excessive use of force in this case. In fact, as the County notes, following her investigation for the MDHHS, Holly Austin concluded that no modifications or changes were necessary to KCJDC's policies and procedures as part of the corrective action plan. (ECF No. 62-9 at PageId.352.)

In short, Anderson fails to meet his summary judgment burden on his *Monell* claim.

### IV.  Conclusion

For the reasons set forth above, I recommend that the Court **deny** Defendants' Motion for Summary Judgment (ECF No. 61) with regard to Anderson's Eighth Amendment excessive force claim against Leshan and **grant** the motion as to Anderson's *Monell* claim against the County.

Dated: December 6, 2022                                             /s/ Sally J. Berens

SALLY J. BERENS
U.S. Magistrate Judge

### **NOTICE TO PARTIES**

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).